## APPEAL OF TSCHUDY LUMBER CO.

Docket No. 3293.    Promulgated February 9, 1927.

INVESTED CAPITAL.—Evidence produced in support of a claimed capital value of a logging contract *held* to be insufficient to support the values claimed and insufficient to warrant the Board in finding any definite capital value for such contract.

*Franklin C. Parks, Esq.*, for the petitioner.
*Thomas P. Dudley, Jr., Esq.*, for the Commissioner.

The petitioner complains of a deficiency letter dated February 11, 1926, asserting a deficiency in income and profits taxes for the calendar year 1918 in the amount of $23,146.98, and prays for a redetermination of such deficiency.

The petitioner alleges that the Commissioner erred in excluding from invested capital for the year 1918 the amount of $220,282.09 as paid-in surplus, representing the value of a contract for the purchase of logs, and that he further erred in disallowing a deduction for the year 1918 in the amount of $10,446.52, representing exhaustion of the value of the said contract.

FINDINGS OF FACT.

The petitioner is a Tennessee corporation with its principal office at Kansas City, Mo.

The corporation was organized in 1910 with an authorized capital stock of $25,000, all of which was owned by E. W. Tschudy, except for a few qualifying shares. Until 1916 the taxpayer was engaged in the business of the manufacture of hardwood logs into lumber at its mill at Memphis. Its supply of logs was bought on the open market. The petitioner built a saw mill at Weona, Ark., and started operations there in 1916. The petitioner also did a great deal of mill work for the J. H. Tschudy Hardwood Lumber Co., a corporation with its principal office at Kansas City, which was engaged in the business of the sale of the lumber but did no manufacturing. The stock of the latter corporation was owned by J. H. Tschudy and his

three sons, Jay, Robert, and Frederick Tschudy.   J. H. Tschudy is a brother of E. W. Tschudy, but prior to 1913 neither J. H. Tschudy nor his three sons held any stock in the Tschudy Lumber Co.

All the Tschudys purchased logs from the St. Francis Valley, Ark., timber district and were acquainted with the value of logs from that district.  They also knew of a large tract of timberland in the St. Francis Valley, known as the Collins Tract, containing approximately 27,000 acres.

In 1912 the Tschudy group learned that this land could be purchased for $20 per acre.  Other similar timber land in the immediate vicinity had been sold in 1910 for $25 per acre, and in 1912 for $30 per acre.

Jay Tschudy, representing the Tschudy group, and F. S. Charlot agreed orally in 1912, or early in 1913, to purchase jointly the Collins Tract.  F. S. Charlot was a large stockholder in the Truman Cooperage Co., which owned an adjoining tract of timberland. Charlot was also interested in the Ozark Lumber & Cooperage Co. and the Cairo, Truman & Southern Railway Co., the tracts of which extended in 1912 to the Truman Cooperage Co.'s holdings.  After a cruise the Collins Tract was found to contain 130,000,000 feet log scale of timber suitable for the Tschudy purposes and 70,000,000 feet suitable for the Charlot purposes.

On February 14, 1913, a final agreement was reached by Jay Tschudy and Charlot to the effect that a corporation should be organized to take title to the Collins Tract; that the Charlot parties should take half of the stock of that corporation and the Tschudy parties the other half; that the purchase should be jointly and equally financed; that the Tschudys should be permitted to acquire at once one-half of the stock of the Cairo, Truman & Southern Railway Co., by means of which the logs were to be made available; that the corporation to be formed (i. e., the Weona Land Co.) should enter into a contract with a corporation to be designated by the Tschudys for certain species and sizes of logs at specified prices, as agreed between Charlot and Jay Tschudy, and also to enter into a similar contract with a corporation to be designated by Charlot.  This agreement was oral, except for memoranda made by the parties and their attorney.  On the same day Charlot and Jay Tschudy met Collins, representing E. A. Nixon, owner of record of the Collins Tract, and orally agreed to purchase the said timberland.

At the time these negotiations were in progress it was understood and agreed among the five Tschudys that the capital of the Tschudy Lumber Co. should be increased, and that the five Tschudys should become the stockholders and the officers and directors of that cor-

poration. It was also agreed that the Tschudy Lumber Co. should receive the logs from the Collins Tract.

The written contract for the purchase of the Collins Tract was executed on March 18, 1913, between E. A. Nixon, as the seller, and four corporations, including the petitioner, the J. H. Tschudy Hardwood Lumber Co., the Ozark Cooperage & Lumber Co., and the Truman Cooperage Co., as the purchasers. The contract provided for the sale of the tract at a price of $20 per acre, the total amount being $535,288.80. Under the contract an initial cash payment of $10,000 was to be made on the date of the contract, a second payment of $15,000 within 90 days, and a further payment of $25,000 six months after the date of the contract. The contract further provided that a new corporation with a full paid-in capital stock of $100,000 was to be organized to take title to the land, and that, after the above-mentioned payments on the purchase price and the organization of the new corporation, the obligation of the Ozark Cooperage & Lumber Co. and the J. H. Tschudy Hardwood Lumber Co. should cease and terminate, except for the further provisions that the purchasers furnish the seller with copies of the minutes of the various boards of directors or other corporate authority sufficient to show binding corporate action authorizing the execution of the contract, and the further provisions that the purchasers guarantee to the seller or holder of the notes secured by deed of trust to keep and perform the covenants contained in the deed of trust. The contract provided further that, upon the payment of the $25,000 above mentioned, the seller should deed the property to the new corporation to be organized, and the balance of the purchase price should be represented by notes executed by the said new corporation, the Truman Cooperage Co. and the Tschudy Lumber Co. jointly, such notes to be secured by a deed of trust. The initial payment of $10,000 and the second payment of $15,000 were made by the purchasers as required under the contract on behalf of the Weona Land Co., which repaid these advances.

In or about April, 1913, the new corporation contemplated in the contract of March 18, 1913, was formed under the name of the Weona Land Co. One-half of the stock of this corporation was taken by the Tschudy parties and the other half by the Charlot parties.

On June 5, 1913, a certificate authorizing the increase of the capital stock of the petitioner from $25,000 to $100,000 was issued by the Secretary of State of Tennessee. All of the old stock was turned in to the petitioner and canceled, and on November 15, 1913, the new capital stock was issued, at par, to E. W. Tschudy, 250 shares, and to J. H., Jay, Robert, and Frederick Tschudy, 187½ shares each. In payment for the new stock E. W. Tschudy left in the corporation all

of its assets, including the saw mill at Memphis, with the equipment, logs, lumber, and cash on hand to a total value of about $32,898.70. The other recipients of the capital stock each paid in, in lumber and cash, $18,750. The $100,000 of authorized capital stock was thus fully paid in.

On September 18, 1913, the third payment required under the contract of March 18, 1913, was made by the Weona Land Co., and on the same date a deed to the Collins Tract was given by E. A. Nixon and his wife running to the Weona Land Co., the Truman Cooperage Co., and the petitioner, as grantees. On November 1, 1913, the Truman Cooperage Co. and the petitioner gave a quitclaim deed of the land running to the Weona Land Co.

On September 18, 1913, the Weona Land Co. entered into a contract with the petitioner giving it the right to purchase all logs of certain sizes and species cut from the entire Collins Tract, delivery to be made on board the cars at the spur track of the Cairo, Truman & Southern Railway Co. The contract fixed the prices of $6.50 per thousand feet, log scale, for certain sizes and species, and $2.50 per thousand feet for logs of certain other sizes and species. To these prices there was to be added for the first year in which the contract should be in force a sum of $4.25 per thousand feet to represent the cost of logging from the stump to delivery on board the cars. This logging charge was subject to revision at the expiration of one year, if required by circumstances. On the same date a similar contract was entered into by the Weona Land Co. with the Truman Cooperage Co.

The Weona Land Co. was organized for the purpose of holding title to the timberland and cutting the timber. It was not intended to make any profits and the charges made against the Truman Cooperage Co. and the petitioner were to cover the purchase price of the timberland and the cost of logging. The profits were to be made by the Truman Cooperage Co. and the petitioner. The petitioner, prior to entering into this contract, bought on the market for $15 per thousand feet, log scale, and $11 per thousand feet the same species and sizes of logs it was to get from the Weona Land Co. for $6.50 and $2.50 per thousand feet, respectively, plus logging costs.

### OPINION.

TRUSSELL: This proceeding presents for determination (1) whether a certain logging contract had a capital value, and the amount of such value, if any; (2) whether such contract came into the possession of the petitioner as a contribution of capital in the nature of paid-in surplus; and (3) the allowance of an annual deduction

from gross income based upon the gradual exhaustion of such capital value.

We have no doubt that business contracts, under which operations are to continue over a period of years, can properly be said to be valuable to both or all parties to such contracts. The contract here in question no doubt might have been the subject of sale or exchange, and if such sale or exchange had occurred, it might have established a capital value in such contracts, but no such exchange has taken place. It appears probable that the petitioner, either late in 1913 or early in 1914, began operations under this contract. Later, in the early part of 1918, it seems to have posted this contract on its books of account at a capital value of $260,000. Its valuation witness produced at the trial computed a value of $318,839.75, using an apparent difference between the cost of logs under this contract and the price at which the petitioner had purchased logs during the years 1911 and 1912, and applying a mathematical formula to such difference in cost over an estimated period of operations of twenty years. The computation of this valuation expert is not persuasive. An apparent differential in the cost of logs plus a mathematical formula, while perhaps sometimes useful, is not, standing alone, proof of capital values.

The evidence does not satisfactorily show whether the logs which were to be furnished under this contract would be of the same or similar nature to the logs purchased by the petitioner in the Memphis market. While the record of this case does not show the basis upon which logs are purchased in the Memphis market, it is taken for granted that the cash price of logs in that market is fixed after inspection of the particular logs to be purchased and is not based upon standard grades. The record is wholly lacking in proof that the logs to be acquired by the petitioner under the contract could or might have had a selling price equal to the figures at which the petitioner had purchased logs in the Memphis market.

In one of its earliest decisions (*Dwight & Lloyd Sintering Co.*, 1 B. T. A. 179) the Board took the position that in ascertaining the capital value of an operating contract it would consider the results of operations under that contract in years subsequent to the basic date. At the time of the trial of this case the petitioner presumably had been operating under this contract for upwards of twelve years, and yet the record is silent as to what such operations produced in the matter of gains or losses, as well as the kind and quantity of logs procured under the contract. We are thus constrained to hold that the record of this case, so far as evidence of value of this logging contract is involved, is insufficient to support either the estimated value placed on it by the petitioner in 1918, or the computed value offered in evidence at the trial, and that the Board would not be war-

ranted, upon the evidence, in undertaking to establish any figure of capital value.

Having arrived at this conclusion, the petitioner's .claim for exhaustion necessarily fails, and there is no occasion for making any findings as to whether the contract came into the hands of the petitioner as a contribution of capital.

> *The deficiency may be recomputed in accordance with the foregoing opinion, pursuant to Rule 50, and judgment will be entered in due course.*